Okay, our first case today is In Re Generic Pharmaceuticals pricing antitrust litigation. Mr. Johnson. Thank you, your honor, and may it please the court. The district court's decision certifying these direct purchaser classes rests on reversible errors on numerosity and predominance. On numerosity, the court openly acknowledged the complete absence of direct evidence that joined or is impracticable. In fact, every single class member here is known, yet not one would say joined or posed any problem. But rather than follow settled precedent on what's needed to prove numerosity without direct evidence, the court took reversible legal shortcuts. How many people are in the class for numerosity purposes? So the debate is, as to the clomipramine case, the debate is between 42 and 69. We say, of course, that 46 and I think you subtract four that's settled, so you have 42, is that right? Four additional opt-outs since the district court ruled, your honor, so those are not likely opt-outs, those are actuals. And the other one's what, 128 or something? The other one goes from 128 to 86. So you're really only talking about the one with in the 40s, right? I'm speaking on behalf of the defendants, but my friend Mr. Corpus can speak to the clobetisol case if there are particular questions about that record. Have we ever held that a class with more than 40 members failed the numerosity requirement? No, but you also haven't held the contrary, and you made it very clear in the Ollie decision that a class of 41 doesn't necessarily satisfy numerosity. The closest to a reversal is the Third Circuit's decision in, excuse me, the Fourth Circuit's decision in Zettia, where there was a debate at the point when the case came to the Fourth Circuit about whether there were 35 or 42 members in the class. On remand, the district court in that case said there were seven opt-outs, likely opt-outs, that should not be considered, so it was a 35-member class. But at the point when that reached the Fourth Circuit, there were 42, arguably 42 members in the class. I assume you can argue that this focus on numbers is not really what numerosity has to deal with, that it could be 39, it could be 41, but what we're really looking at is the substantive analysis that the courts made, that it can't just be that the number of controls, perhaps there's some number in the thousands at which point the test is going to be settled, or in the single digits at which point, it's hard to imagine how, but it's got to be more than just a counting exercise, right? That's exactly right, your honor. So talk about what the court did here substantively and why you think that that was. So there were two fundamental legal errors, both reversible under this court's decision in Modafino. First, calling ordinary joinder analysis misplaced in this complex MDL bellwether, it compared the efficiency of class adjudication with that of wholly distinct individual actions. And second, it declared joinder uneconomical without any evidence on the cost of litigating. So both of those are reversible errors under this court's decision in Modafino. In fact, both the Third and the Fourth Circuits have held that if you depart from the binary comparison of the efficiency of class adjudication versus the efficiency of joinder and start looking at individual actions, that's reversible error. And for good reason. Individual actions are different. They're different in terms of the incentives of the plaintiffs, and they're different in terms of the cost of litigating. An individual plaintiff that brings their own action naturally wants to control the litigation more than a party that joins. There is also, of course, the cost factor. And I think the Fourth Circuit in Zettia said it well, they said if you do a binary comparison of individual actions versus the efficiency of a class action, the deck is stacked. You're always going to conclude that a class action is more efficient. So it's important to stick to the binary choice that this court set out in Modafino. I would note that there was an independent legal error then on the second Modafino prong, and that's the incentive and ability to litigate, where everybody agrees that, you know, you look at whether absent members have negative value claims, and everybody agrees that the way you determine whether a party has a negative value claim is to compare, of course, the possible recovery with the cost of litigating. Here there was no evidence of the latter whatsoever. The plaintiffs have speculated about what some of the parties have done in other cases, but those cases go both ways, and I would suggest that that actually just underscores the importance of evidence about this case. Sometimes there will be incentives to join, other times not, but here the burden is on them. It's a rigorous burden. Ali says that repeatedly, and the fact that it's, you know, that there's a bit over 40 or dozens more doesn't change that burden. The plaintiffs still have to show that joinder is impracticable. What about the combined if, I mean, so the district court looked at the MDL actions, it looked at the DAP actions, it took all of that collective experience and said, this shows that the factors on Modafino are going to be satisfied. Why isn't that enough to to meet the burden? Two reasons, your honor, because as the Supreme Court said in Galboam, an MDL is not just one big monolithic action. It is made up of a bunch of separate and distinct actions. Second, I would, I can't improve upon what you said in Modafino. You said that the district court can rely on its superior understanding of how the case has proceeded to date for the purpose of determining whether the class mechanism would have actually been a substantially more efficient use of judicial resources than joinder. So you look at the individual case, and there may be some relevant experience there. We're not saying the district court's experience is entirely irrelevant, but it's constrained by the binary choice that Modafino requires, and it's limited to the case. Here, the district court looked at very distinct individual actions. Some of those actions involve only indirect purchaser claims that we'll talk about in a bit. Many of the others involve both indirect and direct. So you've got 50 state laws, and of course, again, the individual plaintiff has a different set of incentives when it comes to how to litigate the case. Now, in, there's only one defendant left in each class action matter. Klebetosol, there's one defendant left. Is that right? Activists is here in the Klebetokol case. And in the other one, your client, Mylan, is the only one left. If I may, those are both independent reversible errors, and I won't recount all of the other legal errors of the district court and how, just really not following the evidence where it leads, but I'd like to talk a bit about predominance before I sit down and we hear from my friend, Mr. Sobel. On predominance, I will talk a little bit about the averaging analysis and why that's substantively flawed, but I'd like to begin with a very simple point that is independently reversible under both hydrogen peroxide and Lamictal, and that's that the district court failed to consider the substantive analysis of Dr. Johnson, our expert. Here at the Daubert stage, But the court considered Johnson's points made, right? I'm sorry? But the court considered Johnson's points made, did they not? There's no evidence of that, your honor. What about pages on the appendix 25, let's see, there's at least a number of instances where the court does deal with Johnson's rebuttals, supposedly. I respectfully disagree, your honor. There's about three sentences on this issue, and the district court said that, this said, although the court's analysis in Daubert was decided under a different standard, the same analysis applies here. There, the court determined that Dr. Leitzinger's model does not match data through averaging, which was apparent given that Dr. Leitzinger tested his results against defendant's transaction data with no significant variation in results, and then he says on the next, she says on the next page, as the court determined in Daubert, his model is reliable and produces virtually the same results using multiple data sets. At the appendix 25 to 27, the court's opinion, 35 where it noted at least it considered the expert's reports, that that is a bit superficial, but also 69 to 73. It merely didn't mention Johnson, but it dealt with the points that he made and gave rebuttals to that. Your honor, there is no analysis of the core of Dr. Johnson's analysis, which is why the sensitivity test was actually also using averaging. So the plaintiffs here are really offering you a slate of hand. They say, oh, well, he redid his analysis in response to the criticism of Dr. Johnson, and at that stage in the redo, they used actual transactional data, but that data was averaged, and that's the critical point, and there's no discussion of that in the district court's opinion. I would point the court to page A-1774 of the record. This is where Dr. Johnson says this. It says, more specifically, Dr. Leitzinger calculates a single average net price across all purported purchaser class members and defendants for each glimper mean strength and each month using manufactured transactional data. In doing so, he once again disregards price variations and individual negotiations between purchasers and manufacturers. This issue mirrors the flaw found in his baseline model uses AMP, that's average manufacturer price. We're not saying the district court has to cite chapter and verse of an expert's report, but there is no engagement with this point. On pages 57-58 of your opening brief, you said that Johnson had testified that Leitzinger's sensitivity test did not confirm the validity of his original model. 100 percent. Because it shared its flawed reliance on averages. Now, the district court disagreed with that finding in its Dalbert opinion. Leitzinger's sensitivity test meaningfully reinforced the findings of his original model by revealing his predictions about how prices would change, closely track changes in actual prices. There's a reference to the sensitivity test, yes, but no reference to its critique, your honor. This is what the district court said at Dalbert. But it then incorporated Leitzinger, basically it chose Leitzinger's model which was reinforced by backup. Was there not? There was a regression analysis done, was there? Two things, your honor. Dr. Johnson's critique of the sensitivity test, which again came at a later stage, we had no reply on Dalbert. There was no opportunity to present that there. This is the district court said at Dalbert. You'll find this on page 39 of the Dalbert opinion. It is not the court's role under Dalbert to determine the merits of an expert's finding or to resolve disagreements between experts. There was a punt. Then, at class certification, there was no engagement with the issue on which she punted. That's an independently reversible error. And this is super important substantively because Johnson explains how they're averaging masked individual difference in prices. And that's, it's like you have a clock that strikes 13. And here's what the plaintiffs did in response to learning that their clock struck 13 in this case. They said, well, let's make it so the chime doesn't ring 13 times. But they didn't redesign the clock. The methodology never changed. They took their class definition and narrowed it. But we still don't know about other uninjured members of the class. So that's, those are the, in essence, it's those two problems under Lamyctol and hydrogen peroxide, the failure to consider Dr. Johnson, and then on the substance, there's averaging that masked individual price. In a few places in the Dalbert opinion, the district court noted your objections, but then said those really go to the weight of the evidence, which for Dalbert purposes, maybe that's okay because it's the issue is reliability only. But is that sufficient for class certification? Not at all. In fact, hydrogen peroxide speaks directly to that. It says that rule 23 sets a higher bar. I see that my time for my principal argument has expired. I'll save the balance for Rubar. May I please decode? Just a few points. The clobetisol class is slightly larger than the problems. It's not about the numbers. It's about the evidence. In both cases, the lower court presumed if you have more than 40 class members, numerosity is satisfied. But that is not the teaching, as you've heard from Mr. Johnson, 40 is not some magic threshold. And regardless whether the number is 128, as DPP say, or 86, as defendants say, DPP still have to show the joint is impracticable, and they have not done so here. As Mr. Johnson said, in both cases, the DPPs are all known. They are sophisticated entities who are experienced with litigation and are financially able to sue. Importantly, the big three wholesalers made 62% of clobetisol class purchases, but none of them are either named plaintiffs or have opted out. They are just sitting on the sidelines. And that's exactly the problem where it was identified in Value Drug and Modafinil, where very large purchasers with millions of dollars at stake are sitting on the sidelines, even though they are perfectly capable of joining issue and litigating in an action here. And that factor alone weighs heavily against certification. The court, as Mr. Johnson said, did no analysis of the actual cost of litigating, and that is itself a reversible error. It relied instead on its practice in the MDL. But the practice in the MDL actually teaches you the opposite in our submission, because in this MDL, the plaintiffs have all cooperated. They've all worked together. They've all shared resources. So we actually believe that an MDL makes it easier to proceed on an individual basis rather than on a class action. And on the predominance point, I have nothing to add to what Mr. Johnson said, other than it's the same model. The same problem with the model affects both classes. And for that reason, the court erred in not considering Mr. Johnson's rebuttal. Thank you. Thank you. Good morning, and may it please the court, and congratulations, Judge, to you and to your law clerks. Tom Sobel for the direct purchaser class. The class is. The first point I want to make is a fairly simple one, but an important one. This jurist, Judge Roof, is sitting on one of the most complex MDLs that there has been. Now, that does not mean that the rules of the game change here, but rather the type of discretion that this jurist is using is based not only on a specific case, but on the other 96 dockets and the MDL docket that she is currently overseeing. And in these cases, they are very similar. They all involved generic drugs, alleged price hikes, alleged collusion, multiple defendants, different kinds of plaintiff groups, and all the rest of that. When this judge writes in a decision that I have observed personally for almost a decade, the consequences that would happen if I were required to add another 100 or so plaintiffs on one of these cases and another 50 or 60 or so on another, and I tell you, unequivocally, without any qualification at all, that is unmanageable. That's what she wrote in her decision. That is unmanageable. That decision by her is entitled to deference by this court. And it's unmanageable because? It is unmanageable because if you take a look at the number of plaintiffs that you would have, the number of lawyers you'd have, the different ways that these claims can be pressed, you can either do just price fixing, or you can do market allocation. You can try to do one drug, or you can try to do a handful of drugs. You can try to do certain kinds of drugs. Let's look at ointments here. Let's look at antidepressants there. But that worked in the reverse. Suppose the MDL was one-third the size, and if the class wasn't certified, it would add 17 new plaintiffs. And the judge says, I've been at this for 10 years. There's no way I can handle another 17. There's no way the court can handle another 17. Is that enough under Rule 23? Because it seems like we're just blurring the MDL analysis into the Rule 23 analysis. Yeah. I agree with that entirely. Therefore, I don't want my point to be misunderstood. I don't think, and I'm not suggesting that there should be different rules for the fact that you've got an MDL and it's complex. No. What I am suggesting is, however, if you've got a jurist who's observing what happens not only in the specific case here, clomipramine or clovetisol, but that jurist is also looking at what's happening with 100 other cases of a similar type, then that jurist's experience and knowledge about what's going to happen with his or her or their deference. So I agree with you, Your Honor. It should not be the case that there are separate rules for an MDL. I would not go into that on that way. That's the first point. Can you tie that to the text of Rule 23 or even the Montefiano factors, that experiential idea that we should defer to the practical observations of the trial court? Where does that fit into? I think it comes right out of the modafinil case. Let me see if I can find the right quote to it. The district court is free to rely on its superior understanding of how the case has proceeded to date for the purpose of determining whether class mechanism would have been actually substantially more efficient than joinder from the outset of litigation. So what is the superior understanding of this particular jurist? It's based not only on the clomipramine and clovetisol case, but also as she herself on her own evoked her own knowledge about what's been going on. But as your friend observed, class actions will always be more efficient. You don't need a lot of experience on an MDL to know that. Just by definition, they'll be more efficient. Yes, I think that's correct. What's the evidence that it would be too costly to have putative class members proceed by joinder? So as our brief points out, the enormous costs that this judge has already sat on looking at various settlements that have happened and attorneys fees requests and costs that have been imposed. As an example, one of the settlements had over 13 million dollars in just expert expenses that were involved. I don't think that Judge Rupp was required to actually pull out a calculator and calculate how much it takes to litigate any particular case when she could make the bare and sensible observation which she did, which is look at these classes. About a half or more of the claimants purchased less than a million dollars of the product. Therefore, their damages are less than a million dollars. There's a set large segments of these classes that purchased, literally purchased, less than a hundred thousand dollars or fifty thousand dollars worth of the product. There's troubling on the table though, right? I mean it would seem that even if you have a claim below a million dollars, troubled recovery could be particularly worth pursuing individually, right? If the dollars would add up, right? But so if you have an example, that's the kind of question and I hear you, but I don't, do we have the analysis of whether the dollars would add up? Because I understand what you're saying. You don't want to have to turn this all into some sort of arithmetic exercise, but you do need at least some understanding of what the individual claim is going to look like. And if you have a bunch that are hovering around a million or right below, that's several million dollars in potential recovery. I'm not sure that economic interest isn't worth pursuing individually or that you would at least want to engage in that. Yeah, I think what I would counsel the court to take a look at then is, and this is the appendix numbers get a little bit messed up between the two cases, but if we look at the from the appendix in the clomipramine case, I would direct the court's attention to appendix 1675 through the several pages after that, where Dr. Leitzinger identifies total net purchases by class members for these two classes. And I think what you'll see is any common sense, look at this, there are some that have spent $1,000, $18,000, $4,000, $11,000. There are numerous class members in the clomipramine and the de minimis purchases. So even if their damages, which would be less than their purchases, are trebled, you're not going to have any practical common sense notion that these parties are going to join in litigation. And that's why, as an example, for instance, you don't see direct evidence of this. Direct evidence meaning somebody saying, I don't want to be involved. Imagine like that sort of contradiction. It's a little ironic. You have to submit a declaration to a court and be involved in order to say you don't want to be involved. These people do not participate in litigation. If we make that also clear in our brief, of the 40 odd times that these classes have been certified, there have been five occasions where empirically this joinder issue has been tested. And in each one of those occasions, most of the class members, in four of those five, most of the class members did not join. And the standard of review for this is what? Discretion. Abuse of discretion on both these issues. And I'll just turn briefly to the predominance issue. If you could, if you would, please. Where did the district court address the substance of Dr. Johnson's arguments against the Leisinger report? I gave what I thought were examples 25 to 27, 35 and 69 to 73. But Mr. Johnson disagrees with that. Yeah, well, I think those are the sections where, let's put it in context, the court is reviewing the defendant's critiques of Dr. Leisinger's analysis. By definition, their critiques are coming from Mr. Johnson. So, although Judge Roof is not using Mr. Johnson's name, she's saying this is what the defendants are arguing. And she's rebutting them in the Daubert decision and also in the class certification decision. And then the question becomes, did she do so adequately? And did Dr. Leisinger too? Yes, that's right. And is the Daubert standard sufficient for what we're doing at class certification? It is not. And that's the question you asked before. So, that's why I would direct your attention to, again, Appendix 27, the court's decision on class certification, where she says, Dr. Leisinger's model, quote, is reliable and produces virtually the same results using multiple data sets. That's the second sentence of the second full paragraph there. So, the court understood, Judge Roof understood there was a distinction between the Daubert standard and the class certification standard. The standard of class certification is preponderance of the evidence. She's got to basically land somewhere on it. And I would suggest that in context, that's exactly what Judge Roof does. It's particularly what she does because she expressly recognized that these standards are different, and yet she's this ruling. I think it's fair and appropriate for this court to understand that she knows what she's doing. Therefore, when she's approving the class certification, she's following the right standard. And I think that that sentence directs us to that. But isn't that what hydrogen peroxide is cautioning against? I mean, perhaps it's a fair inference, but I think you agree. We have to infer that from the context of what the district court didn't say, as opposed to saying, there's the engagement with Dr. Johnson's report. It's substantive, and it reaches a conclusion that it prefers Dr. Leitzinger for whatever reasons, all of which the district court is certainly in the best position to do. But we're left trying to figure out if that happened from the inference and context, as you suggest. Doesn't that run counter to hydrogen? I don't think it runs counter to hydrogen. I think, though, candidly, Your Honor, it depends upon how it is that this court decides to read in tandem Judge Roof's Daubert decision and the class certification decision. And you might conclude that, no, I don't think there's enough. Frankly, I think that in this context, you should. And you should because of what it is that she lays out the different standards in her class certification decision, so she knows what the differences are. And again, as an example of the sentence that I gave you, where she's landing on where it is that is reliable, I think there's somewhere else in the decision where she also is landing on why it is that she concludes this. And by the way, it's also important, I think, to understand what was before her when she was looking at making these observations. Again, I would draw your attention to Dr. Leitzinger's exhibits 5A and 5B, which are at Appendix 1681 and 1682. And here, Dr. Leitzinger graphically shows what the difference was in the pre-conspiracy purchase price of these drugs and what the post-conspiracy price was for each class member right down the line, for the 69 in clomipramine and for the 130 or so in clobetasol. For each one, he identifies what the maximum potential price difference could have been, which is a tiny little blue dot, and then for each member goes through what the overwhelming price was. In context, therefore, Judge Porter, I would suggest that when you are going back and your law clerks are going back and taking this reading, you ought to, in fairness, also look at what was the information that was before this judge when making this decision. Because here, in this particular situation, it is manifest that the material that was before her graphically shows for each named class member how they paid 300 or 1,000 or 1,600 percent more than they had before. We haven't talked about Comcast. So is there one claim with four theories? Is there one theory? One theory, one claim of harm. The theory is that there was a conspiracy between generic drug companies that increased the price of the drug, period. One theory, just like there was in the modafinil situation. So the price fixing, the bid rigging, the market allocation... Only had one effect. The effect is only a price increase. One effect, one effect only. If, on the other hand, Comcast said, no, there were different kinds of effects of these different kinds of theories, then that would present a different situation. But as we instructed our economist, as we told Judge Roof, it's one conspiracy, one effect, price increase, therefore, we're all set with Comcast. Does the Marcus case help you or hurt you in connection with the predominance, in other words, choosing between the experts? Yeah. I think in this situation, that case is neutral because I think in this situation, I think the court had, as I pointed out, just a dramatic amount of information that is showing, identifying who the class member is, what they were going to pay before the conspiracy, and what they paid afterwards. That kind of dramatic evidence... In connection with the experts, I thought the problem in hydrogen peroxide was the court refused to choose at the class certification stage between which expert to go with. But here, you have a choice being made. Clearly. She clearly lands with Dr. Leitzinger. I mean, I think that she's made that clear from the very beginning to the end. Whether or not she's using the right standards and saying that, I think, again, will depend upon the court's reading. I think we're pretty clear, though, she is 100% lean resting on the fact that Dr. Leitzinger presented a very solid opinion here. So the duty of the district judge is to resolve the dispute of the experts, and you're saying that the district judge here did so? Absolutely. Again, I want to reinforce this, Your Honor, so you understand it, too. What Dr. Leitzinger did here was not simply compare what happened before to what happened afterwards. Judge Roof said, I don't want you to do that. You cannot do that. Instead, what Dr. Leitzinger did is he looked at a broad range of generic drugs over a long period of time to be able to look at all of the market influences that go on, and did an amazing regression on that. And then he took these specific drugs, and he looked at how it is that the behavior of the market dynamics have happened for these two drugs. And then he took the manufacturer's own data and mapped it against the class members. She landed on this expert for a sound and good reason. Is there anything else? Thank you. Thank you, Your Honors. And may it please the court again, I'd like to begin with predominance and point the court to page 27 of our reply, which recounts the six citations on this question of whether there was a substantive consideration of the effect of the drug on the market.  Johnson's analysis, there was not. There are six citations from the district court, one to Lamictal, one to Dalbert, one to her own Dalbert ruling, and then three to the plaintiff's May 2024 reply. We had no reply. That reply was filed before the defendants could even respond to the May 2024 sensitivity test. The sensitivity test was submitted, this is at A-1611, appendix 1611, three months after our Dalbert motion, we got no reply. And then it's kicked. And I encourage you to comb the class certification opinion. What there is no substantive analysis of is how Dr. Johnson's critique of the sensitivity test undermines that analysis. On Comcast very quickly, there are four different theories. Does the Marcus case, does the Marcus case help you or hurt you? If I'm thinking of the right, the passage you're thinking of in Marcus, I think it says stuff. Discussion of the defendant's expert rebuttals. In other words, I think we said in Marcus that there really wasn't a discussion of the expert's rebuttal. And we said, although we would prefer a more explicit discussion in comparison of the competing expert testimony, we cannot conclude that the court abused its discretion in violation of hydrogen peroxide. Your Honor, the court doesn't have to use magic words, doesn't have to say chapter and verse, but there is not a substantive analysis of the critique of the sensitivity test. There just isn't. There are three sentences on this issue, and I read them to you earlier. I can't say more than that, but it does not engage with the fact that the sensitivity test itself used averages. When they say they use transactional prices, they're giving you a sleight of hand. And I would you back to Dr. Johnson's analysis on that. Is there a substantive analysis in the Daubert opinion, which then becomes, as it were, incorporated into the certification? There couldn't have been, Your Honor. The sensitivity test was submitted in May 2024 after our briefing was done. So she says this is just like Daubert. All right, so turning back to Comcast quickly, there are four theories, and they have distinct price impacts. And so I would just give you a simple example. Suppose there's an agreement to raise list prices to a set level, but then compete under that ceiling. That's very different than if you agree to allocate customers. Aren't all those things different paths, the same theory that you conspired to fix prices? No, they're not all price-fixing theories, Your Honor. They're customer allocation and market allocation and bid rigging. This is addressed in our briefs. I won't spend more time on it. I just want to touch briefly on numerosity. Your friend argued, yes, there's all those different ways, price-fixing, bid rigging, and the allocations. But there's only one effect, and it's higher prices at the end. And that's what I was trying to say, Your Honor. They have very distinct price effects. And the example I gave is if you allocate customers, then the defendant has huge leverage over that customer. So it's going to have a very different effect on price than if you say, okay, here's the ceiling, and we can compete below it. You're saying it's too vague and broad just to say there's just one effect, and now it's higher prices. Yeah, you have to look at this theory by theory. The district court said, oh, this is all under Sherman Act Section 1. I'm sure I don't need to tell Your Honors that's a very broad statute, and there are a lot of different theories that have been advanced under it. So turning then finally to numerosity, Mr. Sobol admits that the district court looks at other cases, and he says this is one of the most complex MDLs ever. I would point you to your own language in Modafino where you say this. District courts may, quote, not consider the possibility that plaintiffs may bring individual suits. Then at page 249, the district court abuses its discretion when it considers issues that have no place in the numerosity requirement. It's an abuse of discretion to make that comparison rather than the comparison to Joinder. As to Judge Ambrose's questions about cost, there's no evidence of actual cost, and when Mr. Sobol refers to empirical evidence, he is giving you pure speculation. And this court has reversed numerosity determinations four separate times, three times because the evidence was speculative. The bottom line, Your Honor, is that it was their burden to satisfy Rule 23 both as to numerosity and to predominance. The standard is rigorous. They have not met it, and the standard of review cannot save them on this record. I urge the court to reverse. Take the matter under advisement. Thank you.